## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

REUVEN T. HERSSEIN,
on behalf of himself, the general
public, and those similarly situated,

      Plaintiff,

v.

AGA SERVICE COMPANY (d/b/a
ALLIANZ GLOBAL ASSISTANCE),
JEFFERSON INSURANCE COMPANY,
      Defendants.

_____/

CASE NO.:

## CLASS ACTION COMPLAINT

COMES NOW, the Plaintiff, Reuven T. Herssein, by and through his undersigned counsel, and files this complaint against AGA Service Company d/b/a Allianz Global Assistance and Jefferson Insurance Company, and as grounds therefore states as follows:

## INTRODUCTION

1. Plaintiff, Reuven T. Herssein, by and through his counsel, bring this class action against Defendants AGA Service Company d/b/a Allianz Global Assistance ("AGA" or "Allianz"), Jefferson Insurance Company ("Jefferson"), (collectively, "Defendants") to seek redress for Defendants' unlawful, unfair, fraudulent and deceptive practices relating to their online marketing and sale of insurance policies on the checkout pages of ticketing and travel websites.

2. This is a case about Defendants' longstanding practice of charging consumers with hidden and bogus fees. On major event and travel websites and the websites of the major airlines,

Defendants purport to make a straightforward offer to consumers: insurance for the event tickets and travel arrangements consumers purchase on those websites. However, Defendants secretly and unfairly charge unsuspecting consumers additional fees, *on top of the calculated premium*, without disclosing that they are charging those fees. In places other than the checkout screens where the transactions occur, Defendants try to justify those fees by representing that the fees are for a supposed assistance service. That service purports to allow insureds to spend time on the telephone with AGA's customer service representatives to request information about various topics, such as directions, weather, restaurants, hotels, new travel arrangements, and possibly medical needs. But consumers are unaware of any such service and they do not want it; and they certainly do not want to pay what Defendants charge for it.

3. Under Florida law Defendants must file their insurance rates with the insurance commissioner and cannot charge any rates or fees above their approved filings.

4. Under Florida law an appointed agent such as AGA is not permitted to collect a fee for services constituting or arising out of the transaction of insurance. In the end, the assistance service is a sham and a pretext to collect illegal fees at the expense of millions of consumers.

5. Here, Defendants present an offer of insurance for a single price that, unbeknownst to consumers, consists of both an insurance premium and a required fee for add-on services. Defendants never disclose the amount they are charging for these "phone assistance services" fees during the purchase of the insurance.  Only *after* the consumer has paid for what they believe is the insurance premium for their travel or event tickets, Defendants send an email disclosing that the fee paid includes the assistance services.

The bundled fee for assistance services was not filed with or approved by the insurance commissioner. AGA does not provide written disclosure of its compensation to insureds and, of course, insureds do not sign any such disclosures.

6. In sum, Defendants have devised a scheme to circumvent insurance laws, and the assistance service is just a pretext to collect illegal fees at the expense of millions of consumers.

7. Plaintiff bring this action on behalf of himself, the general public, and classes of similarly situated individuals, seeking a judgment against Defendants that would, among other things: (1) prohibit Defendants from charging mandatory and/or undisclosed fees (in addition to premiums) for AGA's role (whether purportedly for "assistance" services or otherwise) in connection with the insurance purchases; (2) require Defendants to plainly and truthfully disclose all insurance premiums, fees, and charges to consumers *prior to* their online purchase of insurance and to give consumers the option to accept or decline particular add-on fees; and (3) require Defendants to pay restitution or damages to Plaintiff and class members.

**<u>PARTIES</u>**

8. Plaintiff, Reuven Herssein is, and at all times alleged herein was, an individual and a resident of Florida.

9. Defendant AGA Services Co. d/b/a Allianz Global Assistance ("AGA") is a Virginia corporation headquartered in Richmond, Virginia. AGA maintains its principal place of business at 9950 Mayland Drive, Richmond, VA 23233. AGA is an affiliate of Jefferson and AGA is Jefferson's registered agent and registered administrator for insurance business transacted in or issued in Florida. AGA registered agent and registered administrator for insurance business transacted in or issued in Florida.   AGA has

substantial contacts with and receives substantial benefits and income from Florida, and throughout the United States.

10. Defendant Jefferson Insurance Company is a New York corporation headquartered in Richmond, Virginia. Jefferson maintains its principal place of business at 9950 Mayland Drive, Richmond, VA 23233. Jefferson underwrites some of the insurance policies at issue in this lawsuit. Jefferson, directly and through its agents, has substantial contacts with and receives substantial benefits and income from Florida and throughout the United States.

11. AGA and Jefferson are referred to collectively herein as "Defendants."

12. With respect to the allegations herein, AGA acted as the agent of Jefferson and, in doing the things herein alleged, was acting within the scope and course of its authority as such agent.

13. With respect to the allegations herein concerning policies underwritten by Jefferson: (a) the acts and omissions of each of AGA and Jefferson concurred and contributed to the various acts and omissions of each other in proximately causing the injuries and damages as herein alleged; (b) AGA and Jefferson each aided and abetted the acts and omissions of each other in proximately causing the damages, and other injuries, as herein alleged; (c) AGA and Jefferson each ratified each and every act or omission complained of herein; and (d) AGA and Jefferson were each a member of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

14. Jefferson is jointly and/or vicariously liable for Allianz's wrongful conduct in connection with the marketing and sale of Jefferson policies.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs.

16. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

17. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of Florida. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from services provided to persons in the State of Florida. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of Florida. Defendants' wrongful acts and omissions occurred in Florida.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of Florida, including within this District.

19. Plaintiff accordingly allege that jurisdiction and venue are proper in this Court.

## DETAILED SUBSTANTIVE ALLEGATIONS

20. Insurance is a highly regulated service in every state. Florida requires insurers and their agents to obtain approval for insurance rates prior to offering those policies and rates to consumers, and to clearly identify the approved insurance premium to consumers. There are also strict requirements if an insurance producer wishes to charge a fee for its services.  Accordingly, producers must identify any fees they charge separately from the

premium and in sufficient detail for consumers to understand the fees and for there to be a determination that the fees are in compliance with the insurance laws and regulations.

21. There are also strict requirements if an insurance producer wishes to charge a fee for its services. An insurance agent (or producer) such as AGA is not permitted to collect a fee or compensation from consumers unless (a) it provides written disclosure of the compensation it receives from both the consumer and the insurer and (b) the consumer provides written consent to the fees and commissions at issue. Insurance producers cannot charge fees in connection with the procurement of insurance, above what they earn in regular commissions, without having advised the prospective insured, in writing, the amount they will be charged. Accordingly, producers must identify any fees they charge separately from the premium and in sufficient detail for consumers to understand the fees and for there to be a determination that the fees are in compliance with the insurance laws and regulations.

22. Reasonable consumers expect that insurers and their agents comply with all laws and regulations, that insurance premiums will be clearly identified *prior* to purchase, and that any separate, additional, producer, or non-insurance service or fee will also be clearly identified *prior* to any agreement to pay for such fee. Reasonable consumers who are quoted a single price for insurance reasonably assume that price is a lawful and approved premium and not a vehicle for hidden fees added to the insurance premium. In any event, Florida law prohibits Defendants from imposing hidden and/or mandatory add-on fees in their insurance offers to consumers.

23. AGA markets and sells trip insurance policies and event ticket insurance at issue. AGA is responsible for obtaining approval of the Jefferson policies and rates at issue. AGA is

responsible for charging and collecting the premiums and fees at issue. AGA purports to provide a supposed "assistance service" for which it deceptively, unfairly, and unlawfully charges consumers, and has been unjustly enriched by those unlawful, unfair, and undisclosed fees.

**I.      Defendants Charge Unsuspecting Consumers for Supposed "Non-Insurance Assistance Services" in Conjunction with Trip Insurance**

24.  When purchasing airfare and similar travel fares or accommodations from online websites or mobile apps, consumers are often presented with the option to insure their purchase. Defendants are the largest providers of trip/travel insurance in Florida and the United States.

25.  When Defendants present an insurance offer, it is the only available option. An example of offers made by Defendants on the website of American Airlines are below:

**[[THIS SPACE IS INTENTIONALLY LEFT BLANK]]**

## Add Trip Insurance? 

**Please select Yes or No**

◯ Yes, protect my trip for $49.25 total. ✓ **Highly Recommended**

**Can't travel?**
Get back up to 100% of your trip costs if you have to cancel your trip or return home due to a covered situation like a covered illness or injury, or you're required to work.

**Travel delayed?**
Get reimbursed for eligible items, meals, and accommodations due to a covered travel delay.

**Lost bag?**
Get protection for lost, damaged, stolen, or delayed personal belongings throughout your entire trip.

**Need help?**
Get help on your trip when dealing with anything from a medical emergency to seeking flight information, and more with an always-ready assistance team.

◯ No, do not protect my **$607.97** trip to Las Vegas.

ⓘ *4,855,545 American Airlines customers protected their trip in the last year*

Review Period: If you're not satisfied, you have 15 days to cancel your plan and receive a full refund of the plan price. Plans are generally non-refundable after that period, or if you have started your trip, filed a claim, or the policy has ended. Cancellation rules may vary by plan and state; see your plan details.

Recommended/offered/sold by 3rd party, Allianz Global Assistance, not American Airlines. Underwriter: Jefferson Insurance Company or BCS Insurance Company. Plan incl. insurance & assistance services. Terms & exclusions (incl. for pre-existing conditions) apply. Plan & Pricing details, disclosures, Coverage Alerts

26. As indicated above, a single total price is identified for the "insurance" or "protection" prior to purchase. The consumer may "add Trip Insurance" or "protect" the trip for that specific price.

27. Defendants do not always include a reference to any assistance service or benefits, but when they do include a reference, it is briefly mentioned as one of the benefits of the

8

"insurance" and is typically characterized as "included" and related to a "travel or medical emergency." Within these point-of-sale offers, Defendants do not identify assistance benefits as separate, non-insurance services and Defendants do not indicate that the assistance services come with an additional charge, separate from the premium.

28. The hyperlink to "plan details and disclosures" does not provide sufficient notice to consumers that they are being charged for supposed non-insurance services on top of the calculated premium for the insurance product.

29. First, there is no statement within the offer that the price includes a fee for non-insurance services.

30. Second, the hyperlink is in fine print and follows the sentence "Terms and exclusions (incl. for pre-existing conditions) apply." That suggests that the plan details accessible by hyperlink concern the insurance terms, not that there is a separate fee for a supposed non-insurance service.

31. Third, even if a consumer follows the hyperlink, the landing page has a table at the top of the page, which includes a prominent list of benefits (such as "Trip Cancellation Coverage," "Trip Interruption Coverage," "Travel Delay Coverage," and "Baggage Loss Coverage"), and the benefit entitled "24 Hour Assistance" is identified as "Included," without any indication that there is a separate charge for that benefit. This table provides no notice to a reasonable consumer that he or she will be charged both an insurance premium *and a mandatory additional fee*, supposedly for assistance services.

32. After purchasing the trip insurance, the customer is sent a confirmation email that contains the policy number and the total cost of the insurance. The email confirmation includes a hyperlink to the "policy documents." The vast majority of insureds never follow the link to

the policy documents. The policy documents also include a cover letter, which, **for the first time**, identifies a separate charge for "assistance." Summaries of the types of information insureds may request through Defendants' assistance service appear in the policy documents under the headings "Travel Services During Your Trip" and "Concierge Services," the vast majority of which are inapplicable to or not valued by purchasers of the policies. These services entitle insureds to call a toll-free number to speak with customer service representatives to obtain various types of information, including where to refill prescriptions, where to find child care equipment, referrals to pet care services, destination information (including information concerning nearby restaurants, hotels, events, and activities), information regarding business services, information regarding gift deliveries, information related to replacing passports, information regarding doctors and medical facilities, legal referrals, and finding translation services. To access such informational assistance services, insureds must supply their policy number and other information.

33. There is no significant demand in the market for the assistance benefits purportedly offered by AGA, in the form in which they are offered and separate from actual claim events. This is especially true of domestic travel. Reasonable consumers who insure their trips do not retain AGA's telephone numbers and their insurance policy numbers, and are not interested in paying AGA so that they have the option to call AGA for information encompassed within AGA's travel assistance services.

34. Consumers who purchase airfare online and through mobile applications can readily find the information encompassed within AGA's assistance services for *free*, and on demand, using the internet and widely available applications (such as from Google, Apple, Yelp,

and many other service providers), or from more local or personalized sources than AGA can offer. Reasonable consumers are not interested in paying money to have the option to call AGA's toll-free hotline, after first searching for their insurance policy number and other information regarding their event, then spending several (and likely many) minutes on hold and/or speaking to multiple service representatives, having customer service agents note their inquiries, conduct searches related to those inquiries, and then eventually (hours or days later) email or call the insureds back with some of the requested information. That is an inefficient, slow, and belabored process for obtaining information, especially as compared to the widely available means of obtaining such information promptly and for free.

35. Given that reality and given that Defendants make no mention of any separate charges for such services at the time they present their insurance offers to consumers, consumers have no reason to suspect they are being charged for AGA's non-insurance assistance service at the time they insure their event ticket purchases. Consumers would not pay for such a service if given the choice whether to do so.

36. In any event, the vast majority of insureds are not aware of the availability of those services or that they have been charged for them until after they have paid for what they believe is the insurance premium.  Neither the insurance offer nor any other portion of the checkout pages where online travel purchases and events tickets are completed display on those pages the specific amount the consumer will be charged for supposed non-insurance assistance benefits, and consumers have no ability to obtain the travel insurance or ticket event insurance while declining the embedded assistance fee.

37. For instance, for Plaintiff's December 2024 trip to Spain, Defendants sent the following letter to Plaintiff which stated in part:

> This packet contains your Declaration of Coverage, your Policy/Certificate of Insurance, and a description of the Travel Assistance Services available to you. The total amount paid was $1,728.54, which includes $1,576.02 for insurance and $152.52 for assistance—giving you access to our worldwide team of problem-solving experts that can help with medical and travel-related emergencies.

> See Spain Policy full cover page Exhibit A

38. If AGA were genuinely attempting to market an informational assistance service, it would likely offer it for free (using advertisements to cover costs) or it would charge a flat, attractive fee and highlight some competitive edge over the alternative sources of information available to consumers. Instead, AGA *hides* its agency fee and the assistance service from consumers at the point of purchase, uses a formula that *increases* the fee according the purchase and risk at issue, and does not actually invest in providing a convenient informational assistance service. To minimize attention to the additional fees it charges, AGA sends contradictory messages to two different audiences: (a) suggesting to consumers (during the solicitation) that there is just a single insurance premium (to keep them ignorant of the additional charge), while (b) suggesting to regulators that the fee for assistance services is distinct from the insurance premium (to present a lower premium figure and to try to avoid further scrutiny of the "non-insurance" fee).

39. Regardless of how Defendants' "assistance" fees are ultimately characterized—whether as an artifice to collect an unlawful agent's fee or as genuinely for non-insurance services (that no one wants)—the result is the same: Defendants collect more from consumers than they should. Defendants did not receive approval from the Florida Department of Insurance to charge these mandatory, hidden fees on top of the premium. And if they did

the fee schedule for the assistance fee is false and misleading.  If Defendants followed the laws and regulations, they would not be charging such fees. And if Defendants disclosed the fees to consumers *prior* to purchase, consumers would not pay for the fees. Defendants are continuing to charge and collect sums that they are not allowed to collect by law and which are more than consumers would pay if they understood Defendants' practices.

40. In sum, Defendants' practice of charging consumers for supposed "assistance" in connection with trip insurance is deceptive, unfair, and unlawful.

## II.     **Defendants Charge Unsuspecting Consumers for Supposed "Non-Insurance Assistance Services" in Conjunction with Event Insurance**

41. When purchasing tickets to events from online websites or mobile apps, consumers are often presented with the option to insure their purchase. Defendants are the dominant providers of event ticket insurance in Florida, and the United States, and the main (if not only) provider of such insurance on the Ticketmaster.com website.

42. When Defendants present an insurance offer for an event, it is the only available option. Examples of offers made by Defendants below:

**[[THIS SPACE IS INTENTIONALLY LEFT BLANK]]**

13



43. When consumers purchase event tickets on Ticketmaster.com and similar websites, Defendants present consumers with an offer of insurance during the checkout process. When such an offer is presented to a consumer, Defendants' offer is the only available option for protecting the event ticket purchases.

44. The offer is plainly described as "Ticket Insurance" and "Event Ticket Insurance for an additional $[amount] per ticket." Accordingly, reasonable consumers understand the insurance premium to equal the quoted price. The "assistance" service is essentially a toll-free line to customer service representatives. The "Ticket Insurance" offer never mentions any agent's fee or any charge (in addition to any calculated insurance premium) for a supposed non-insurance assistance service. Typically, a consumer will purchase the insurance without ever realizing that he or she paid AGA for access to a toll-free customer service line.

45. The "Ticket Insurance" offer includes a hyperlink for "Plan details and disclosures," but it does not provide sufficient notice to consumers that they are being charged for supposed

non-insurance services on top of the premium for the insurance product. First, there is no statement within the offer that the price includes a fee for non-insurance services. Second, the hyperlink is in fine print and follows the sentence "Terms and exclusions (incl. for pre-existing conditions) apply." That suggests that the plan details accessible by hyperlink concern the insurance terms, not that there is a separate fee for a supposed non-insurance service. Third, even if a consumer follows the hyperlink, the landing page includes a prominent list of three benefits in a table at the top of the page: (1) "Ticket Cancellation Coverage," for "Up to event ticket cost" (subject to a maximum); (2) "Viewer Advantage," characterized as "Included;" and (3) "Pre-existing Medical Condition Exclusion Waiver," described as "Available." This table again provides no notice to a reasonable consumer that he or she will be charged both an insurance premium *and a mandatory additional fee*, supposedly for assistance services.

46. After purchasing the event ticket insurance, the customer is sent a confirmation email containing the policy number and total cost of the insurance. The email confirmation includes a hyperlink to the "policy documents." The vast majority of insureds never follow the link to the policy documents. The policy documents also include a cover letter, which, for the first time, identifies a separate charge for "assistance" services, which AGA and Jefferson call "Viewer Advantage Services" in their event ticket insurance policy documents. These "assistance" or "Viewer Advantage Services" entitle insureds to call a toll-free number to speak with customer service representatives to obtain various types of information, including directions, information concerning nearby restaurants, hotels, and parking garages, weather forecasts, destination information, information related to replacing passports, and information regarding doctors and medical facilities. To access

such informational assistance services, insureds must supply their policy number and other information about the insured event (such as the venue and date).

47. There is no significant demand in the market for the assistance benefits purportedly offered by AGA, in the form in which they are offered. Reasonable consumers who insure their event ticket purchases are not interested in paying AGA so that they have the option to call AGA for information encompassed within AGA's "Viewer Advantage Services." Consumers who purchase event tickets online and through mobile applications can readily and promptly find the information encompassed within AGA's "Viewer Advantage Services" for *free*, and on demand, using the internet and widely available applications (such as from Google, Apple, Yelp, and many other service providers). Reasonable consumers are not interested in paying money to have the option to call AGA's toll-free hotline, after first searching for their insurance policy number and other information regarding their event, then spending several (and likely many) minutes on hold and/or speaking to multiple service representatives, having customer service agents note their inquiries, conduct searches related to those inquiries, and then eventually (hours or days later) email or call the insureds back with some of the requested information. That is an inefficient, slow, and belabored process for obtaining information, especially as compared to the widely available means of obtaining such information promptly and for free. Given that reality, and given that Defendants make no mention of any separate charges for such services at the time they present their insurance offers to consumers, consumers have no reason to suspect they are being charged for AGA's non-insurance assistance service at the time they insure their event ticket purchases. Consumers would not pay for such a service if given the choice whether to do so.

48. Neither the insurance offer nor any other portion of the checkout pages where online event ticket purchases are completed display, on those pages, the specific amount the consumer will be charged for supposed non-insurance assistance benefits, and consumers have no ability to obtain the ticket insurance while declining the embedded assistance fee.

49. If AGA were genuinely attempting to market an informational assistance service, it would likely offer it for free (using advertisements to cover costs) or it would charge a flat, low fee and highlight some competitive edge over the alternative free sources of information available to consumers. Instead, AGA *hides* its agency fee and the assistance service from consumers at the point of purchase, uses a formula that *increases* the fee according to the purchase and risk at issue, and does not actually invest in providing a convenient informational assistance service. To minimize attention to the additional fees it charges, AGA sends contradictory messages to two different audiences: (a) suggesting to consumers (during the solicitation) that there is just a single insurance premium (to keep them ignorant of the additional charge), while (b) suggesting to regulators that the fee for assistance services is distinct from the insurance premium (to present a lower premium figure and to try to avoid further scrutiny of the "non-insurance" fee).

### III.  Plaintiff's Purchase Experience as to Travel Insurance

50. On or about December 2, 2024, Plaintiff Herssein visited the website aa.com to purchase an American Airlines flight from Miami to Spain for him and his family. The cost of that fare for six (6) premium seat tickets was $20,317.86.

51. After selecting his flight, he reached a checkout screen, where he was presented with an offer to purchase insurance for the trip. The offer was presented in a manner substantially

similar to the example set forth herein. AGA designed, controlled, and possesses the exact offer text presented to Plaintiff Herssein.

52. AGA and Allianz's offer was the only insurance option presented to Plaintiff. There was no choice of plans or insurers during the checkout process, and very limited information was provided regarding the insurance. A single price of $1,728.54 was stated as the price of the "insurance." There was no indication that any other fees other than an insurance premium was included in that price. In particular, the insurance offer never mentioned any fee for "non-insurance assistance services." Such services were either not mentioned at all or else assistance benefits were only briefly mentioned without any indication that they were a non-insurance service subject to a separate charge.

53. Within a couple of days, AGA sent Plaintiff Herssein a confirmation email regarding his purchase of trip insurance. The email identified the policy number EUSP2457294655 and the total amount it did not identify either the insurance premium or the cost of any purported assistance benefits in the body of the email. The email confirmation includes a hyperlink to the "policy documents." The policy documents reached by way of that link include a confirmation letter, a "Declaration of Coverage," the Jefferson insurance policy/certificate form (including a description of the purported travel assistance services and concierge services), and the privacy policies of AGA and Jefferson. The cover letter disclosed, for the first time, that Plaintiff Herssein was being charged a separate fee of **$152.52** for the assistance fee. Specifically, and in relevant part, the cover letter stated:

> The total amount paid was $1,728.54, which includes $1,576.02 for insurance and $152.52 for assistance—giving you access to our worldwide team of problem-solving experts that can help with medical and travel-related emergencies.

54. In the foregoing transaction, neither the insurance offer nor any other portion of the checkout pages disclosed (a) a specific breakdown of the components of the price for the insurance; (b) that the price included an unlawful agent's fee; (c) the existence and amount of the fee for supposed non-insurance assistance benefits; and/or (d) any material facts about the nature of such "assistance" services, or that the supposed "assistance" service is largely a sham (as consumers are generally not aware of it, do not value it, and Defendants were and are not prepared to actually provide the service in a way that would provide actual value to consumers).

55. In each case, Plaintiff Herssein was not aware of the existence of any fee in addition to the insurance premium and was not aware of any of the foregoing facts at the time he purchased the trip insurance. As a result of those material omissions, Plaintiff Herssein agreed to pay AGA and Jefferson, or AGA, to *insure* the trip and believed that the amounts he paid Defendants were for the **trip insurance only** and that the amounts charged were determined by a regulated, lawful process. Plaintiff Herssein never would have agreed to pay and would not have paid the assistance fee had he had the opportunity to decline it separate and apart from the premium related to trip insurance.

56. In each instance, Plaintiff Herssein was seeking only lawful and proper insurance; he was not seeking informational "assistance" services and would have placed no, or hardly any, value on the information services purportedly included with the travel insurance she purchased. He was not aware of and did not agree to pay for any additional or unlawful agent's fee or any additional "assistance" service that Defendants purport to offer to their insureds.

57. With respect to each transaction, Plaintiff Herssein would have declined the fee for Defendants' supposed "assistance" service, and the entire offer, if Defendants had fully and fairly disclosed: (a) that AGA charged an unlawful agent's fee in addition to the premium; or (b) the existence and amount of the fee/charge for supposed "assistance" services and basic information about the supposed "assistance service" (such as that it was a toll-free number for presenting inquiries to customers service representatives regarding the topics included in the alleged services), which would have allowed him to understand that the supposed "assistance" service was practically worthless to him, would not provide actual material benefits to him or most other consumers, and is a pretext for increasing Defendants' profits.

58. On each of these occasions, Plaintiff Herssein would have paid less than he did if AGA and Jefferson had complied with Florida law and charged him only an approved premium, rather than unfairly, unlawfully, and deceptively including an undisclosed, additional fee in the cost of the "insurance."

59. Plaintiff Herssein would not have purchased insurance from Defendants if he had known about this deceptive assistance fee and had doubts about their integrity and reliability, and he would have had such doubts if Defendants had fully and fairly disclosed the material information.

IV.        **Plaintiff's Purchase Experience as to Event Ticket Insurance**

60. On or about February 10, 2025, Plaintiff Herssein visited the website Ticketmaster.com to purchase a ticket to a live event: a Miami Heat game at Kaseya Center in Miami. The price of the ticket was $150.00, including a $6.35 processing fee, $4.75 facility charge, $20.65 service fee, and $10.50 in tax.  The total price for the ticket was about $192.25.

61. During the checkout process for that purchase, Herssein was presented with an offer from AGA and Jefferson to purchase insurance for the event tickets. The offer was presented in a manner substantially similar to the sale of travel insurance. There was a box/section on the checkout page presenting him with an option to insure his event ticket purchase. AGA designed, controlled, and possesses the exact offer text presented to Plaintiff Herssein.

62. AGA and Jefferson's offer was the only insurance option presented to Plaintiff Herssein. There was no choice of plans or insurers during the checkout process, and very limited information was provided regarding the insurance. A single price of $7.69 was stated as the price of the "ticket insurance." There was no indication that any other fees other than an insurance premium was included in that price. There was no mention of "non-insurance assistance services" in the offer. (Unbeknownst to Plaintiff Herssein at the time he accepted the offer of insurance, the total amount he was charged for the insurance comprised $6.21 in event insurance premium and $1.48 in mandatory assistance services fees, which may be characterized as an unlawful agent's fee.)

63. Neither the insurance offer nor any other portion of the checkout pages disclosed (a) a specific breakdown of the components of the price for the insurance; (b) that the price included an unlawful agent's fee; (c) the existence and amount of the fee for supposed non-insurance assistance benefits; and/or (d) any material facts about the nature of such "assistance" services, or that the supposed "assistance" service is largely a sham (as purchasers of event ticket insurance are generally not aware of it, do not value it, and Defendants were and are not prepared to actually provide the service in a way that would provide actual value to consumers).

64. Plaintiff Herssein was not aware of the existence of any fee in addition to the insurance premium and was not aware of any of the foregoing facts at the time he purchased the ticket insurance. As a result of those material omissions, Plaintiff Herssein agreed to pay AGA and Jefferson to insure his event ticket and believed that the amount he paid AGA and Jefferson was for the ticket insurance only and that the amount charged was determined by a regulated, lawful process. Plaintiff Herssein was seeking only lawful and proper insurance; he was not seeking informational "assistance" services and did not place any value on the information services purportedly included in AGA's "Viewer Advantage Services." He was not aware of and did not agree to pay for any additional or unlawful agent's fee or any additional "assistance" service that Defendants purport to offer to their insureds.

65. On or about February 10, 2025, AGA sent Plaintiff Herssein a confirmation email regarding his purchase of event ticket insurance. The email identified the policy number EUSP2471135565 and the total amount paid ($7.69); it did not identify either the insurance premium or the cost of any purported assistance benefits in the body of the email. The email confirmation includes a hyperlink to the "policy documents." The policy documents reached by way of that link include a confirmation letter, a "Declaration of Coverage," the Jefferson insurance policy/certificate form (including a description of the "Viewer Advantage Services" and an endorsement entitled "Required to Work"), and the privacy policy of AGA and Jefferson. The cover letter disclosed, for the first time, that Plaintiff Herssein was being charged "$6.21 for insurance and $1.48 for assistance." However, Plaintiff Herssein did not see the hyperlink to the policy documents, had no reason to believe that those documents would reveal a hidden charge for "assistance" services, and

did not review those documents during the 10-day cancellation period for the policy. Plaintiff Herssein never would have agreed to pay and would not have paid the assistance fee had he had the opportunity to decline it separate and apart from the premium related to event ticket insurance.

66. Plaintiff Herssein would have declined the fee for Defendants' supposed "assistance" service, and the entire offer, if Defendants had fully and fairly disclosed: (a) that AGA charged an unlawful agent's fee in addition to the premium; or (b) the existence and amount of the fee/charge for supposed "assistance" services and basic information about the supposed "assistance service" (such as that it was a toll-free number for presenting inquiries to customers service representatives regarding the topics included in the Viewer Advantage Services), which would have allowed him to understand that the supposed "assistance" service is worthless, does not provide actual material benefits to him or other consumers, and is a pretext for increasing Defendants' profits. Plaintiff Herssein would have paid less than he did if AGA and Jefferson had complied with Florida law and charged him only an approved premium, rather than unfairly, unlawfully, and deceptively including an undisclosed, additional fee in the cost of the insurance. Plaintiff Herssein would not have purchased insurance from AGA and Jefferson if he had doubts about their integrity and reliability, and he would have had such doubts if AGA and Jefferson had fully and fairly disclosed the material information referenced in the first sentence of this paragraph.

## V.  Because Defendants Intend to Continue Their Deceptive and Unfair Conduct, a Public Injunction Is Needed to Protect the Public from Future Harm

67. An injunction is necessary to stop Defendants from violating Florida law and from continuing their unfair and unlawful conduct in charging add-on fees for travel insurance

and event ticket insurance. Defendants should be prohibited from charging supposedly separate fees for "assistance" services as a mandatory fee in connection with the sale of insurance policies and from charging fees and/or premiums that have not been approved in Florida.  Among other things, Defendants should be required to plainly and truthfully disclose, within their offers of travel insurance and event ticket insurance: (a) the specific, authorized premiums and all distinct fees and charges to consumers, including the existence and amount of the fee for supposed non-insurance assistance benefits; (b) material facts about the nature of such "assistance" services; and (c) how much compensation AGA would receive from Jefferson for the transaction and how much compensation it would receive for the mandatory assistance fee. Consumers must be given the option to accept or decline the assistance fee or any other add-on fee, and must give informed consent to any such fee before they are charged.

68. Accordingly, to protect the general public from the threat of future injury, Plaintiff seek a public injunction, under Florida law, prohibiting Defendants from continuing the deceptive, unfair, and unlawful practices alleged herein.

69. Plaintiff Herssein will purchase airfare in the future and will be presented with the option to insure those purchases through Defendants. Plaintiff Herssein desires to insure her travel purchases but, absent the injunctive relief sought, will not be able to determine whether she will be charged a hidden fee or an unlawful mandatory agent's fee in addition to the insurance premium. Plaintiff Herssein has a right to know the insurance premiums and the additional fees for any putative insurance transaction and Defendants are infringing those rights. Plaintiff Herssein is unable, and will continue to be unable, to rely on Defendants' representations regarding the price of their insurance products, unless the

injunctive relief requested in this Complaint is awarded. That present and continuing uncertainty is an ongoing harm to her as a consumer and infringes the rights protected by the insurance laws and regulations. Even if he were able to determine that Defendants will impose an unlawful agent's fee in addition to charging a premium, absent an injunction prohibiting Defendants from doing so, she will be forced to either forgo the insurance she desires (and the only insurance available) or else pay an unlawful fee.

70. Accordingly, there is a risk that Plaintiff and those similarly situated will be harmed again in the same manner, or be deprived of the opportunity to purchase lawfully and fairly priced insurance, which would be available on ticketing sites but for Defendants' unlawful, deceptive, and unfair practices.

**<u>CLASS ALLEGATIONS</u>**

71. Plaintiff brings this class action lawsuit on behalf of the following proposed class ("Class") of similarly situated persons, pursuant to Rule 23 of the Federal Rules of Civil Procedure, defined as follows: All Persons, except Excluded Persons, who purchased at least one or more (a) Qualifying Travel Plan from December 2, 2020  and/or Event Protection from February 10, 2021 Plan through and including the date the Order Granting Preliminary Approval is entered and, for that purchase, provided a billing address in the State of Florida or if no billing address was supplied directly to AGA, the Travel and/or Event Protection Plan identified the plan owner as having a Florida address; and/or (b) Qualifying Travel and/or Event Protection Plan from through and including the date the Order Granting Preliminary Approval is entered, and, for that purchase, provided a billing address in the State of Florida or if no billing address was supplied directly to AGA, the Travel and/or Event Protection Plan identified the plan owner as having a Florida address.

72. Plaintiff reserves the right to propose additional or alternative classes or subclasses, or to narrow the above class definition. This reservation includes but is not limited to classes or subclasses involving consumers in multiple states or involving particular issues.

73. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

74. Numerosity: Plaintiff does not know the exact size of the Class, but they estimate it includes millions of members. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

75. Common Questions Predominate: This action involves common questions of law and fact to the potential Class because each class member's claim derives from the same deceptive, unlawful and/or unfair statements, omissions, and practices. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class include, but are not limited to, the following:

    a. whether Defendants had a common, automated practice of charging consumers mandatory assistance fees on top of insurance premiums for travel insurance and event ticket insurance, without an option to decline or avoid those fees;

    b. whether Defendants had a common, automated practice of charging consumers mandatory assistance fees on top of insurance premiums for travel insurance and event ticket insurance, without disclosing the amount, nature, and bases of those fees— until after the consumer purchases the insurance.

c.  whether not giving the consumer the option to decline the assistance fees, which are not disclosed, is unfair, fraudulent and deceptive.

d.  whether Defendants have engaged, and continue to engage, in unfair or fraudulent practices by misrepresenting in insurance offers that the prices charged were solely for the insurance premium, and by failing to disclose that the amounts charged to Plaintiff and class members included mandatory distinct assistance fees;

e.  whether the fees Defendants' charged for their supposed assistance services constitute unlawful agent's fees;

f.  whether Defendants have engaged, and continue to engage, in unfair practices by circumventing regulatory scrutiny and charging unlawful and excessive agent fees and/or premium charges, and thus charging consumers more than they are legally allowed to charge;

g.  whether the fees Defendants' charged for their supposed assistance services constitute unlawful premium or whether the premium rates and the assistance fee rates at issue were approved for use in Florida;

h.  whether Defendants' conduct violates their duty of good faith and fair dealing;

i.  whether Defendants knew or should have known that reasonable consumers did not value the assistance services offered by AGA;

j.  whether Defendants knew or should have known that reasonable consumers interpreted Defendants' insurance offers as a single premium and were unaware of any additional fee for AGA;

k.  whether Defendants' conduct is otherwise unlawful, unfair, or deceptive;

l.  whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

m.  the amount of profits and revenues earned by Defendants and/or the amount of monies or other obligations lost by class members as a result of the misconduct;

n.  whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

o.  whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

76.  Typicality:  Plaintiff's claims are typical of the claims of other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct in which the Defendants engaged in violation of law as described herein. Further, the damages of each member of the Classes were caused directly by Defendants' wrongful conduct in violation of the law as alleged herein. Plaintiff and members of the Classes have suffered injury in fact as a result of Defendants' misleading, deceptive, unfair, and unlawful conduct. Plaintiff and members of the Classes would not have paid the assistance fees but for Defendants' misconduct.

77.  Adequacy of Representation:  Plaintiff will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiff has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action

attorneys to represent their interests and that of the Classes. By prevailing on their own claims, Plaintiff will establish Defendants' liability to all class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

78. Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class  may  be  relatively  small,  the  expenses  and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

79. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## **COUNT I**
### **(Common Law Fraud, Deceit and/or Misrepresentation)**

80. Plaintiff realleges and incorporates by reference the paragraphs one through seventy-nine  of this Class Action Complaint as if set forth herein.

81.  Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that they were agreeing to pay approved and lawful premiums for event ticket insurance policies and for trip/travel insurance policies, without hidden, unapproved fees being included within the supposed "premium" for the policies. Defendants represented that their offers were for "Ticket Insurance," "Trip Insurance," "Event Ticket Insurance for an additional $[amount] per ticket," "add Trip Insurance," and the like. Accordingly, reasonable consumers understood the quoted price to fully equal the insurance premium.

82.  Defendants had duties under the Insurance Code and regulations, as well as the common law, to disclose material facts regarding their insurance offers. Defendants knew that the additional cost of and the nature of the assistance service was material to consumers and that consumers, including Plaintiff, would have declined to pay for the assistance service if Defendants had disclosed that they were charging consumers for the assistance service and the nature of that service.

83.  Defendants knew or should have known that consumers did not demand or value the supposed "assistance" services they offered, that consumers would not pay for it if they had a choice, and that consumers did not know Defendants were charging them for it. Nevertheless, Defendants continued to advertise their insurance policies as part of a scheme with the intent not to sell the insurance as advertised and to mislead consumers regarding the nature and extent of the services they were obtaining from Defendants, and regarding the prices of those insurance and non-insurance services. Defendants knew or should have known that they misled consumers regarding: the nature of the price paid for

the insurance, the existence of an additional fee for Defendants, and the existence of Defendants' assistance services.

84. These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew that their misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase insurance at the stated price, and intended for Plaintiff and similarly situated consumers to rely on those misrepresentations and omissions in accepting Defendants' offers of insurance. In misleading Plaintiff and not so informing Plaintiff, Defendants breached their duties to them. Defendants also gained financially from, and as a result of, their misrepresentations and omissions.

85. Plaintiff and the Class Members relied to their detriment on Defendants' misrepresentations and fraudulent omissions. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, declining the fee for assistance services and, if necessary, declining the entire insurance transaction.

86. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, purchase the insurance together with the supposed assistance services.

87. Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

88.  As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amounts they paid for the assistance services.

89.  Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff and those similarly situated.

## COUNT II - (Breach of the Duty of Good Faith & Fair Dealing

90.  Plaintiff realleges and incorporates by reference the paragraphs one through seventy-nine  of this Class Action Complaint as if set forth herein.

91.  The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Accordingly, Defendants had a broad duty to deal fairly and in good faith with their insureds, including Plaintiff.

92. Inherent in every contract there is a duty of good faith and fair dealing.

93.  Defendants breached their duty to act fairly and in good faith by imposing non-declinable assistance fees on Plaintiff above what Defendants were legally authorized to charge in premium, without giving Plaintiff the option to decline the add-on fees and without giving Plaintiff sufficient information about the amount of the assistance fee and the nature of the services at issue.

94. Instead, Defendants offered insurance for a single price and made misleading representations and omissions in their offer that led Plaintiff to believe that they were being charged a simple, lawful insurance premium, without hidden, unapproved fees being included.

95.  Defendants knew or should have known that consumers, including Plaintiff, would not pay Defendants' assistance fees if given the choice, and that consumers did not know Defendants were charging those assistance fees.

96.  Defendants deliberate refusal to identify the charge for their assistance service also made it less likely that insureds would use the service for which they had been charged.

97.  In doing the things alleged above, Defendants considered only their own interests and profits, and they disregarded the interests of Plaintiff and their other insureds. Defendants' conduct was unreasonable, frivolous, and/or unfounded.

98.  As a direct and proximate result of such actions, Plaintiff and the Class Members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such unfair conduct in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Defendants' bad faith conduct caused Plaintiff and those similarly situated to pay money that they otherwise would not have paid. Had Defendants dealt fairly and honestly with their insureds, including by clearly distinguishing the assistance fee from the premium in the insurance offer, identifying the amount of the assistance fee and the nature of the services, and providing consumers the option to accept or decline the assistance fee, Plaintiff and those similarly situated would have declined and/or avoided the fee for assistance services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, those similarly situated, and the general public, respectfully requests that the Court enter judgment against Defendants as follows:

A.  Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.  An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this complaint;

C.  An award of restitution in favor of Plaintiff and class members, and requiring Defendants to disgorge revenues and profits wrongfully obtained, in an amount to be determined at trial (sought as an alternative to an award of damages);

D.  An award of nominal, compensatory and special damages, the amount of which is to be determined at trial, and an award of treble, enhanced, or punitive damages, also in an amount to be determined at trial;

E.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F.  For reasonable attorney's fees and the costs of suit incurred; and

G.  For such further relief as this Court may deem just and proper

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  February 12, 2025.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone
notice66@bmulaw.com

By:     _/s/ Maury L. Udell, Esq._____
         Maury L. Udell, Esq.
         mudell@bmulaw.com
         Fla. Bar No. 121673